Hull, J.
This is a proceeding in error brought to reverse the judgment of the court of common pleas. The plaintiff in error was also plaintiff below, and the verdict was directed by the court against the plaintiff, and judgment rendered in favor of the defendants upon such verdict. This proceed, ing is brought to reverse that judgment.
*592 ■ The plaintiff was a woman engaged in mercantile business-in the village of Maumee, this county. She says in her petition that for some time prior to October 22, 1897, she had been dealing with the defendants, L. S. Baumgardner & Oo., and on that day she was indebted to them in the sum of $1,396.97; and she claims that she entered into an arrangement on that day with the defendants, whereby she secured to them by such arrangement then made this inr debtedness, by turning over to them her stock of goods, upon a contract that they were to set aside a certain amount of goods, sufficient to pay this debt, and that she was to have the balance, and also to have the privilege of selling-the goods which, at the invoice price,amounted to sufficient to pay this debt; that is to say, she was to have the profit on those goods as well as the others. And she claims in her petition fhat with intent and purpose to defraud her, she-was induced at that time by the agent of the defendants to-sign a paper which turned out to be a bill of sals, turning over to Baumgardner & Co,, and transferring to them, her .entire stock of goods, which she claims at that time was of the value of about $3,000. And she alleges that after taking possession of the goods, instead of carrying out what she claims the agreement was, they retained and disposed of the entire stock of goods, to her damage, in the sum of $1,500, '
The defendants in their answer admit that on the day mentioned the plaintiff was indebted to them in the sum of $1,396.97, and admit that the plaintiff had a conversation with defendants about securing the payment of said indebtedness, and that afterwards, under and by virtue of a written .agreement with the plaintiff, defendants took possession of said stock of goods and disposed of it. All the allegations in the petition that- are not so admitted by the answer are denied. Defendants say further in their answer:
“That on October 22, 1897, the plaintiff was indebted to this defendant in the sum of $1,398.77; that on said date plaintiff voluntarily and at her own instance came to defendant, and executed and delivered to defendant a certain bill of sale im writing, whereby she sold, assigned, and conveyed to this defendant all and singular her stock of goods, wares and merchandise,consisting of dry goods and notions,.. *593 and* all other merchandise of every name and description, together with show cases, stools, and all fixtures belonging to her and being in the two story brick building owned by one Mrs. G. B. Mouen, in Maumee, Waynesfield town'ship, Lucas county, Ohio.”
It is alleged in the answer that they then became the absolute owners of said property, which they say was so assigned and conveyed to them for the sole and only purpose of paying and discharging the indebtedness aforesaid,then due from plaintiff to defendants, and that in consideration of' that, they executed to the plaintiff a full and complete release of the indebtedness.
To give the exact language of the plaintiff it is perhaps better to quote from the petition.
She alleges that:
‘‘She called on the said defendants and had a conversation with them about securing .them for the money she owed them, and she had a conversation with one Mr. Hall, who was an agent of the said defendants and acted for them; and it was agreed between the said plaintiff and the said defendants, through the said Hall, who acted for the said defendants, that the said defendants would invoice the goods of the said plaintiff and select therefrom a sufficient amount, at the invoice price, to pay the said defendants the amount of money she owed them, and the balance of the goods the said plaintiff could have to pay her other creditors. But the goods so selected by the defendants should remain in the store occupied by the said plaintiff,and she might sell them in the usual course of trade, but th3 money received therefor should be paid to the said defendants, and when she had paid the said defendants the amount of money due them they should release their claim on the remainder of said goods. The said Hall then prepared a paper writing which he, with intent to defraud her, said, embodied the agreement made with the said plaintiff, and the said plaintiff, relying on the said statements of the said Hall, signed the said paper without reading it, or knowing what it contained more than what said Hall told her, relying on the statements made by said Hall.”
She alleges that the goods invoiced $2,188, but that they were of the value at this time of $3,000; and after this trans *594 action she alleges as I have already stated, that the defendants locked the store, took possession of the goods, and disposed of them,and gave her no part thereof, and have never accounted to her.
The plaintiff tesfified in her own behalf, and called one witness. The case rests largely upon the testimony of the plaintiff. At the conclusion of the testimony offered in her behalf, the court upon motion directed a verdict in favor of the defendants.
The plaintiff in error claims that she was entitled to have the case submitted to the jury upon her claim as to what the real contract was between the parties, She claims that the bill of sale, was not the whole contract between the parties, and that oral testimony as to what was agreed was to be done with the goods, and to show whether the transaction was an absolute sale or a security merely was admissible, and that therefore, under the testimony as it stood at the conclusion of the plaintiff’s case,she had a right to have the case go to the jury.
As to the claim of the defendants, I will read from their brief as follows:
“The common pleas court directed a verdict because a bill of sale was in actual existence,and there was no evidence whatever tending to show that she had been influenced in signing it. This action is not based on the alleged fraud of the defendant, It is based on an alleged breach of an alleged verbal agreement. But her own testimony discloses a subsequent written agreement quite different from the alleged verbal agreement, Until this written agreement is out of the way, her evidence as to verbal agreement is unavailing. Her attempt to rid herself of the written contract by claiming that it was procured by the fraudulent representations of Hall fails, because of the fact that she does not remember that he made any statements as to what the paper contained; because she could read and write, and had every opportunity to know what the paper contained. Besides this failure of evidence, her own actions at the time contradict her present claim.
“Under these circumstances it was for the court to say whether sufficient evidence had been introduced to avoid the written contract, so that a recovery might be had on an al *595 legad breach of an alleged verbal contract. The evidence not being sufficient to avoid the written contract, there was . nothing for the jury to consider.
“Thus it will be noted, that not only'was there no evidence for the jury to pass upon, but the action of the court in taking the case from the jury, was practically an exclusion •of the evidence on the alleged verbal contract, because of the insufficiency of the evidence to avoid the written contract. Of this action of the court there is no complaint, either in the motion for a new trial or the petition in error. ”
It is true that the record does not show, as stated in this •brief, that Mr. Hall, who represented the defendants, made ■any fraudulent representations to Mrs. Mollenkopf as to the ■contents of this paper. She testifies to having a talk with him as the representative of the firm (I will refer to her testimony on.that a little later). She says she cannot remember what he did say, nor whether she read the paper or not; ■but agreeing, as she claims, upon the terms of the transaction, he immediately wrote this paper and handed it to her, ■and in substance told her that she should sign that; that she signed it, and that is about all she remembers about the paper. The paper itself shows that it was witnessed by two witnesses, and acknowledged before a notary public, with ■the same formality and solemnity as a deed.
In order to determine the question whether or not the ■court erred in directing a verdict for the defendants, it will •be necessary to look briefly at the testimony, especially at ■some portions of the plaintiff’s testimony, She testifies that she was indebted to Baumgardner & Co. to the amount of about $1,400. (In fact it was $1,396.97,) She had had «ome talk with them about this indebtedness, and she came to Toledo to see them about it, and she found Mr. Hall in •charge of the credit department of the firm. She says she -said to Mr. Hall, “lam indebted to you for such an amount, and I would like to settle it in some way. If they would come up to Maumee, we would take an inventory, and we would get at the amount of goods; they could take enough >to satisfy the claim, and what was left would be mine. I was owing $250 besides that, and I had other creditors. I wanted them to take their amount out of the stock, and whatever it invoiced over that would be mine. Mr. Hall *596 agreed to that. He said ‘certainly.’ They brought me-a-paper to sign. I was very much worried, and I had been worried for some time.”
And further along these questions, were asked, and answers made:
Q. “You signed it there in the store that day?” A. “Yes, sir.”
Q. “Did you read it?” A. “I don’t think I did; no, sir, ”
Q. “You don’t think you did?” A. “No, sir; I didn’t read it.”
Q. “Was it read to you?” A. “I don’t remember whether it was. I was walking up and down outside the railing. I don’t remember whether it was read to me or not. ”
Then she is asked what she said when the. paper was-brought to her. She says:
“I said ‘before I sign any paper, they must agree that, they were only to take out the amount of their bill from the invoice; I was to retain the rest of it’.”
Q. “What did Mr. Hall say then?” A. “He said,, ‘certainly’. ”
She says:
“I was to retain the goods. They were only to have the-amount of their bill. I was to retain the goods myself, the-rest of it was to be mine.”
She says further along that the goods were to be left in-the store until she had sold them. She is asked, “Was-there anything said between you and Mr, Hall about the contents of that paper?” and answered, “I don’t remember.”
Q, “ W&B that all that took place that day ?” A. “Yes,, sir. ”
She then testifies to Mr. Hall going out and taking possession of the store, locking it up,putting a sign or card on the store that the goods were the property of Baumgardner & Co., or something to that effect. Baumgardner & Co.. then proceeded to take an invoice of the goods, and they told her afterwards that they invoiced $2,188, She says on the following Friday, which was after they had taken-possession of the store, she had another conversation with- *597 Mr. Hall, and be told her that the store could not be opened until after the.invoice. She then testified as follows:’
Q. “You are not asked to state just exactly what he said; nobody can state it after this lapse of time; state your remembrance of the substance of what he said” A. “I don’t think that I can state that — that I couldn’t open the store any more.. That is the only thing he impressed on my mind,that the goods were not mine. I said, ‘Mr. Hall, I don’t understand that is the way I made the agreement with you,’ ‘I am very sorry if you don’t understand it, but if it was otherwise it wouldn’t be legal.’ That is, he gave me to understand they were not mine. That is the first understanding I had of it.”
Q. “Did he say to you at that time it was a bill of sale? ’ A. “He may have mentioned it that way, but I didn’t know what a bill of sale was, and I don’t know anything about it if it was.”
Q. “If he had a title to the goods?” A. “If he did, he told me on that day, on Friday — or Saturday.”
Q. “Where were you at that time?” A. “In the store at Maumee.”
Q. “What did he say then? Try to give his words as near as you can-^-about that being a bill of sale.” A. “I can’t remember the words that he said. I only know that he gave me to understand. I can’t remember what he said. He frightened me so that I didn’t understand.”
She is asked on cross-examination as to that paper.
Q. “This paper is marked ‘Bill of Sale’ right at the head of it; look at it and see if it isn’t. That is the paper you signed?” A. “That is my signature.”
Q “You wrote it?” A. “Yes, sir; it looks very much like mine.”
Q. “You see the words ‘Bill of Sale’ at the top?” A. “Yes, sir.”
Q. “You knew what‘bill of sale’ was? A. “No, sir; I did not.”
She is asked this question:
Q. “You knew you were signing a contract by which you were turning these goods over to them, did you not?” A. “No, sir; only what I thought I signed was an agreement they were to take out what was coming to them.”
*598 She also assigned at the same time to Baumgarder & Co. the insurance policies upon this stock of goods. They gav« her at some time during the transaction a receipt, which she says she did not read. She is asked these questions on cross-examination:
Q. “And at that time he turned over a receipt for your account, didn’t he?” A. “He gave me some kind of a paper one of the days he came up there.”
Q. “Didn’t he give you a receipt for your account?” A. “It was a receipt for something; I don’t know what it was. ”
The Court: Q. “Didn’t you read it?” A. “He laid it on the counter. When I got through talking I went up stairs, He called me back and said, ‘Mrs. Mollenkopf, this is a receipt. ’ I said, ‘What is it?’ He said it was a receipt.”
She said she didn’t read it, whatever it was. It turned out, according to the record, to have been a paper in this language, dated October 22, 1897:
“Received from Mrs. E. Mollenkopf thirteen hundred and ninety-eight and -77-100 dollars in full of account. Th« above amount received in stock of dry goods, notions, etc., situated in Maumee, Ohio, as evidenced by a certain bill of sale of even date herewith. L. S. Baumgardner & Co.”
She says that after this talk with Mr, Hall, when he told her that this was a bill of sale, and that she had lost ber title to the goods, that they took possession of them and disposed of them, and never accounted to her: that they did not set off the $1,400 worth of goods, according to the contract as she understood it, which were to be used in paying their account; her claim being, as I have stated, that Mr. Hall agreed with her that they would take an invoice of the goods, and that goods to the amount of $1,400, at the invoice price, were to be set aside to secure the claim of Baumgardner & Co., and the balance she was to sell to pay her other creditors; that she was also to sell the goods that invoiced $1,400, and was to have the profit, whatever there was, over and above the amount of their debt.
The case seems to have gone off in the court of common pleas upon the proposition that a written bill of sale having been introduced in evidence, which the plaintiff admitted she signed, and there being no sufficient evidence to show *599 fraud on the part of Mr. Hall, that this written contract could not be varied by oral testimony, and that it must be regarded as the contract and the whole contract between the parties. And this is the argument made here by counsel for defendant in error.
It is of course a well settled principle of law that fraud is. not to be inferred or guessed at; it must be proven, and clearly proven, and that a written contract cannot be varied or set aside'without proof of fraud, mistake or some other legal ground to vary it, or set it aside; and where no proper ground exists, the terms of the written contract must prevail, and prior talk between the parties is merged in the written contract. If this bill of sale then was the contract, and the only contract, as is claimed, then the court was justified in directing a verdict in favor of the defendant, for she would be bound by the written contract. If, however, the bill of sale was not in fact the. whole contract between the parties, but was in fact only the execution of a portion of the real contract, then the plaintiff,in our judgment, would be entitled to recover upon the real contract that was made between them, if there was a breach of it and she had suffered any damage. The question as to whether a bill of sale or a deed absolute upon its face may be shown in fact to be only a mortgage, either of realty or chattels,is one that has been before the courts a great many times, and our understanding of the law is that a bill of sale, or even a conveyance of real estate, absolute upon its face, may be shown by parol testimony to have been in fact executed to secure a debt, and therefore should' be held and is to be held, under those circumstances, between the parties as a mortgage, instead of an absolute transfer or conveyance. One of the earliest cases upon this question found in Ohio is Miami Exporting Co. v. Bank, Wright, 249. In this decision by Judge Wright, this is stated in the syllabus:
“Whether a deed is a mortgage or not, is determined by its object; if given as a security, it is a mortgage, whatever its form; the fact of its being so given determines its character, not the evidence of the fact.’’
And Judge Wright says in the opinion, on page 258:
“It is now the acknowledged doctrine, that parol evidence is admissible against the face of a deed to show that *600 ■a mortgage only was intended. * * * And whether a conveyance be a mortgage or not is determined by its object. * * * This is so whether the condition of defeasance form a part of the deed, is evidenced by other writing, or exists qnly in parol, The fact of its being given as security determines its character, not the evidence by which the fact is established.”
In Randall v. Turner, 17 Ohio St., 262, the supreme court say in the syllabus:
‘‘A written assignment of a chose in action, unconditional on its face, in part execution of a contract not intended by the parties to be expressed-in the assignment's not conclusive evidence that the transfer was absolute, but the contract under which it was executed may be shown by other proof.”
The court say in the opinion, on page 269:
‘‘It is claimed that the written assignment on the certificate of stock is conclusive that the sale was absolute and not conditional, as stated in the petition; and that, therefore, the court should have found for the defendants in the action.
‘‘No objection to any of the evidence was interposed, but it is claimed that the written assignment, in law, excluded the consideration of any evidence of a contract but that contained in the written transfer of the stock. It is true that the assignment was,'on its face, absolute and without condition. The assignment was not intended to express the contract between the parties, but .was a part execution of a ■contract that required this, with other things, to be done for a specific purpose. No effort was made to vary the written assignment. That was as the parties intended it ■should be. The use, however, to be made of the assignment, .was to be determined by future events. Whether it was received in absolute payment of a debt or not, was the issue between the parties; and proof upon this question, showing the terms upon which it was held, did not modify ■the written paper.”
And in Wilson v. Giddings, 28 Ohio St., 554, this question is discussed at some length, This is a case where there was a written contract outside of a deed, which provided that the deed should be held and regarded as a mortgage. *601 But the general question is discussed on page 565 of the opinion. The court say:
“There is no principle in equity more firmly settled on authority than that every contract for the security of a debt, by the conveyance of real estate, is a mortgage, and that all agreements of parties tending to alter, in any subsequent agreement, the original nature of the mortgage, is of no effect. ’ ’
And on page 567 the court say, referring to the parties in the case before them:
“I have found no better rule by which to determine the character of the transaction between Wilson and Giddings than the one so clearly stated in Robinson v. Cropsy et al., Edw. Ch. (2d Ed.), 138. It is as follows: In order to determine whether a transaction amounts to a mortgage or a conditional sale, ‘if the deed or conveyance be accompanied by a condition or matter of defeasance, expressed in the deed, or contained in a separate instrument, or exists in parol (whether the consideration is a pre-existing debt or present advance of money to the grantor), the only inquiry necessary to be made is, whether the relation of debtor and creditor exists and a debt still subsists between the parties; for if it does, then the conveyance must be * * treated in all respects as a mortgage’.’’
In Jones on Chattel Mortgages, sections 22 and 23, the question is discussed. I will read a few words frpm those two sections:
“Section 22. A bill of sale absolute on its face, but accompanied by a verbal defeasance, is a mortgage not only between the parties to it, but also as to third persons who have actual notice or such knowledge of the facts as will charge them with notice; and a sale of the chattels by the mortgagor to a third person, in payment of a debt due from him to them, conveys no title.’’
In section 23 the author says:
“But the better doctrine,and that more generally accepted in this country is, that the admission of parol evidence is not confined to cases of distinct fraud, accident, or mistake; but that such evidence is admissible upon the broad ground that the deed of sale, though absolute in form, was intended merely as a security in the nature of a mortgage; *602 and that upon this ground alone courts of equity may take jurisdiction and afford relief. The fault of the instrument in such case is inherent in the transaction itself, and does not arise out of the subsequent conduct of the vendee in attempting to retain the property.”
A decision of the supreme court of Michigan holds squarely that this may be done in a court at law the same as in a court of equity, and that the rule is the same, and that you may show in a court of law what the real contract was between the parties. I refer to Wood v. Parrish, 3 Mich., 211. The syllabus of the case is:
‘‘Parol evidence is admissible in a court of law to show that a bill of sale absolute on its face was intended as a mortgage.”
In the opinion, delivered by Judge Green, presiding judge, is a very full discussion of this question. He says on pages 214 and 215:
‘‘It would appear very strange, then,if not absolutely absurd, for this court to say that a circuit court can afford no relief in a case of this character when sitting as a court of law, while at the same time it is conceded that it might do-so when sitting as a court of chancery, and while it is perfectly obvious that the relief would be as ample, and justice as fully administered between the parties, on the law side-as on the chancery side of the same court. It would not certainly be in accordance with the progressive spirit of our jurisprudence, which seeks to administer justice between-parties by the most direct and simple methods of procedure that are consistent with that order and regularity which ought to prevail in all judicial proceedings for the safety of all. If then, it is admitted, parol evidence is admissible in a court of chancery to prove that a deed absolute on its face, was intended as a mortgage, such evidence is equally admissible in a court of law.
‘‘Whether the admission of parol evidence of a defeasance in this class of cases be regarded as an exception to the general rule, or whether it be upon the ground of fraud, as has been suggested, need not be determined. The parol proof seems to vary the effect of the written instrument, yet it is not given for the purpose of showing that its language is not precisely what the parties intended, The verbal *603 agreement was that just such an instrument should be made, but that the property conveyed by it should be subject to redemption as in the case of a mortgage. The defeasance, however, is left to rest upon the verbal understanding and agreement between the parties. Mortgages, and conveyances intended to operate as mortgages, are generally given by the necessitous to the more opulent, the debtor to the creditor, the borrower to the lender, the suppliant for favor to him who has power to make the terms upon which it shall be granted. The man whose property is about to be sacrificed by a creditor,will not hesitate in regard to the amount of security to be given, nor the manner of giving it, if he can loan the money to satisfy the debt, or otherwise gain time for its payment. He will not hesitate to execute a deed or bill of sale, absolute upon the face of it, but intended to operate as a mortgage, to four times the value of the loan, without insisting upon a written deed of defeasance. To hold that parol evidence is inadmissible to show the intent that the instrument should operate as a mortgage, would enable the selfish and unfeeling creflitor or money lender to gratify his avarice, by violating the plainest principles of common honesty with entire impunity. On the other hand, its admission does no injustice to the creditor, but secures to him the full amount which is his due. He loses nothing, but is only prevented from taking that to which in right and justice he has no claim. Admitting that this constitutes an exception to a general rule, based upon the soundest principles of jurisprudence, what great danger is to be apprehended from it? It has long been familiar to courts of equity at least, and is of safe and easy application in courts of law, organized as our courts now are.”
There is more of this discussion in the opinion, but I will not take the time to read more of it.
Applying this doctrine and these principles, which seem to be established by the authorities, can we say that the court was justified in directing the jury to return a verdict in favor of the defendant? The plaintiff had testified what the real contract was. She testified that she agreed with Baumgardner & Go., through Mr. Hall, that they would invoice these goods, set aside the amount of her debt at the *604 invoice price, and that she was to be free to sell the balance of the goods as she wished, and to sell the $1,400 worth so set aside and have whatever profit she could make on thém; that she signed this paper without knowing its contents, and perhaps without anything being said to her about it; that they at once took possession of the store and of the goods, which they invoiced at about $2,200, about $800 more than her debt to Baumgardner & Co.; that they retained the enr tire stock of goods and accounted to her for no part thereof, According to her testimony, the debt at the time of her talk with Mr. Hall in the store and when the paper was signed was not cancelled, but after the invoice was taken, Mr. Hall laid some paper down on the counter in her store, and said “Here is your receipt.”
It is claimed that this was an absolute sale, and that it should be so held. But it is a significant fact that, according to the testimony in this record, there was no talk between Mrs. Mollenkopf and Mr. Hall about a sale of these .goods. The record is barren of any evidence of negotiation between the parties, There is no testimony here as to any 'bargaining in regard to the value of these goods, no price ■fixed upon them by Mrs, Mollenkopf,no claim by either one that the price was too high or too low. The relation of creditor and debtor existed at the time. She testifies that she went there for the purpose of securing this debt; testifies that when she got to the store she told them that she had come there for that purpose; and so far as her testimony discloses outside of this paper writing itself, her conduct was all along the line of securing this debt to Baumgardner ■& Co., and leaving to her the balance of the goods, if any there should be, after this debt was paid.
It seems to us that the principle laid down in Randall v. Turner, 17 Ohio St., 262, covers this case, and that alone would perhaps be sufficient authority. The court say on page 269, “The assignment was not intended to express the contract between the parties, but was a part execution of a contract that required this, with other things, to be done for a specific purpose. No effort was made to vary the written assignment. That was as the parties intended it should ■be.”
The fact that she alleged in her petition that Baumgard *605 ner & Co. induced her by fraud to sign this bill of sale, and the fact that she failed to establish fraud, would not prevent her from recovering, for it was not necessary for her to establish fraud, under the authorities, It was not required that she should show that by fraudulent representations she was induced to sign this paper. She brought herself within the law when she testified to a contract that this stock of goods was to be held as security,and security only,and that in furtherance of that the bill of sale was signed. If she had signed this bill of sale knowing exactly what was in it, if she had read it before she signed it, and had understood every sentence and every word in it,still if the real contract between the parties was that this property was to be held by virtue of this bill of sale, not as an absolute conveyance, not as the absolute property of Baumgardner & Co., but for the purpose of securing her debt to them, she would then be entitled to recover any damages that she might have sustained by reason of the breach of this contract which she claimed existed between them. As the supreme court of Michigan say, this rule is based upon the plainest principles of justice, that if the creditor recover the amount of his debt, he is getting all that he is entitled to.
M. F. Griffin and Delphy & Corbitt, for Plaintiff in Error.
Doyle & Lewis and Jir. Seiders, for Defendant in Error.
The court erred in directing a verdict for the defendant in this case, and for that reason the judgment of the court of common pleas will be reversed.